**Tracy S. Combs**
**(SDNY Bar No. TS-1026)**
**Attorney for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**351 S. West Temple, Suite 6.100**
**Salt Lake City, UT 84101**
**(801) 524-5793**
**CombsT@SEC.gov**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **COMPLAINT** |
| **v.** | **Civil Action No. 22-CV-10509** |
| **DANSKE BANK A/S,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

Plaintiff Securities and Exchange Commission ("SEC" or "Commission"), alleges:

### SUMMARY

1.      This case concerns violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder by Danske Bank A/S ("Danske" or "Defendant"). From at least 2009 to and including 2016, Danske, directly and through its branch in Estonia ("Danske Estonia"), provided banking services to suspicious customers despite knowing there was a high degree of risk that such customers were potentially engaged in money laundering. Danske also knew or was reckless in not knowing of numerous red flags indicating that its employees and managers at Danske Estonia had, amongst other things, conspired with customers to circumvent the anti-money laundering ("AML") laws and regulations of the European Union, Denmark, and

1

Estonia, and that Danske's internal AML and "know your customer" ("KYC") safeguards were weak and ineffective. Despite these facts, Danske knowingly or recklessly made materially misleading statements and omissions in its publicly-available reports which were translated into English for the benefit of U.S. investors and others, stating that Danske was compliant with its legal obligations to prevent its services from being used for illicit purposes—including money laundering—and that it had effectively managed these risks. Further, Danske engaged in deceptive acts, including misleading Danish regulators and U.S. correspondent banks, to conceal its AML and KYC deficiencies. Danske stopped providing services to its high risk customers by April 2016 but failed to timely disclose to investors known misconduct and widespread AML failures. In September 2017, Danske disclosed that it had "major deficiencies in controls and governance" concerning its branch in Estonia and, in September 2018, disclosed the full extent and nature of the misconduct. The suspicious transactions involved more than $200 billion in funds and comprised nearly all profits earned by Estonia. Danske's stock price began to decline in September 2017 and continued to decline as the scandal became known to the public. Between September 2017 and November 1, 2018, Danske's share price dropped by approximately 49% as the full extent of Danske's misconduct became apparent.

2.      By engaging in the conduct described herein, Danske violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## JURISDICTION AND VENUE

3.      The Court has jurisdiction over this action pursuant to Sections 21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa.

4.      Danske, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and course of business alleged herein.

5.      Venue in this district is proper under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because certain of the acts or transactions constituting the violation of the Exchange Act, or significant steps in furtherance thereof, occurred in or had a foreseeable substantial effect within this district. For example, at all relevant times, Danske's ADRs were sold over-the-counter and quoted by OTC Markets Group, which has its headquarters in New York City; Danske's annual, interim, and other reports containing the misleading disclosures and material omissions alleged herein were translated into English for the benefit of U.S. investors and others and were published and available to actual and prospective investors in this district via Danske's corporate website.

**FACTS**

*Danske's Disclosures*

6.      Danske is a Danish multinational banking and financial services corporation headquartered in Copenhagen, Denmark. At all relevant times, Danske was the largest bank in Denmark and a major retail bank in Northern Europe, with offices in countries outside Denmark. Danske's shares traded in Denmark on the OMX Copenhagen and in the United States over-the-counter ("OTC") as American Depositary Receipts ("ADRs") listed in U.S. dollars, and U.S. investors constituted a significant portion of Danske's shareholders. Between 2009 and 2018, U.S. shareholders held as much as 18% of Danske's stock.

7.      Pursuant to Exchange Act Rule 12g3-2, 17 C.F.R. § 240.12g3-2, Danske was exempt from registering its equity securities under Section 12(g) of the Exchange Act and filing periodic reports under Sections 13(a) and 15(d) of the Exchange Act, provided that, among other

things, Danske publish in English, on its website, information and reports in the form required by the laws of its country of incorporation (Denmark).

8.      Accordingly, between 2009 and 2016, Danske periodically published a variety of reports, including annual, interim, corporate governance, and risk management reports, in English on its corporate website for the benefit of and made available to, *inter alia*, actual and prospective U.S. investors. Certain of these reports contained representations to investors about Danske's risk management processes and disciplines related to the banks systems and controls. Such systems and controls would include Danske's policies and procedures to detect, prevent and mitigate risks to the bank from financial crime, including money laundering.

9.      In Danske's Risk Management Report for 2009, an annual report, it stated:

> The Danske Bank Group has defined a process for operational risk management that ensures a structured and uniform approach across the Group. The process includes risk identification and assessments, monitoring according to key risk indicators (KRIs), controls and mitigation plans.

Danske defined these risks as those arising "from inadequate or failed internal processes, people and systems . . . [and] includes legal risk."

10.     Danske's annual Corporate Governance Reports for the years 2009 through 2012, stated that Danske has "a comprehensive set of processes to support all risk management disciplines" and that Danske "reports extensively on all relevant types of risk."

11.     Additional reports contained representations to investors concerning anti-money laundering controls to prevent illegal activities. In its annual 2013 Corporate Responsibility Report, published in February 2014, Danske stated:

> "We have specific policies on dealing with corruption and preventing money laundering. [Danske] condemns corruption and money laundering activities and takes the steps necessary to comply with internationally recognised standards, including Know Your Customer procedures.  [Danske's] anti-money laundering policy includes procedures for

customer due diligence, reporting, record keeping, internal controls, risk management and communications that are intended to prevent illegal activities."

12.    Danske's annual 2014 Corporate Responsibility Report, published in February 2015, stated that Danske "conduct[s] business in accordance with the laws and regulations of the countries where we operate, and we follow international guidelines and recognised[sic] principles for corporate responsibility, including standards for . . . anti-corruption."

*Despite Its Disclosures, Danske Knew That Danske Estonia's AML and KYC Systems and Procedures Were Noncompliant and That There Were Extensive AML and KYC Breakdowns in Estonia*

13.    Beginning in 2007, as detailed below, there were significant indications that Danske's AML and KYC systems and procedures were not implemented adequately at Danske Estonia and that critical weaknesses and deficiencies had been identified by regulators. By approximately July 2013, Danske knew or should have known of evidence that the services of Danske Estonia were being used extensively for suspicious activity, that its internal risk management procedures were inadequate to prevent such activity, and that its AML and KYC procedures were not being followed in Estonia and were not in compliance with applicable laws and rules. Such suspicious activity accounted for almost all of Danske Estonia's profits and significant portions of Danske's profits in the Baltic Region.

14.    At all relevant times, Danske (including Danske Estonia) was required by European Union, Danish and Estonian laws and regulations to implement policies and procedures to prevent financial crime, including money laundering. To meet its legal obligations and effectively monitor risk, Danske was required to establish AML and KYC policies and procedures in line with regulatory requirements to determine, among other things, the true identity of account holders. Danske was also required to conduct ongoing monitoring of

5

transactions for consistency with customers' business and risk profiles, and report suspicious activity to authorities consistent with applicable law.

15.     Since 2007, when Danske purchased the branch that became Danske Estonia, Danske knew that a substantial portion of the Estonian branch's customers were non-residents of Estonia, a group of accounts known as the Non-Resident Portfolio or "NRP" and that many of the NRP customers were from Russia and other former Soviet-bloc countries. These NRP customers' practices included well-known red flags for potential money laundering: for example, frequent use of offshore LLPs and nominee directors to obscure or conceal beneficial ownership information, use of unregulated intermediaries to carry out transactions on behalf of unknown clients, and ties to jurisdictions with enhanced money laundering risks. Some of these practices were known to Danske in 2007, and by February 2014, Danske knew about the full scope of these practices.

16.     In 2007, the Danish Financial Supervisory Authority ("Danish FSA") contacted Danske with concerns it had received from the Bank of Russia about NRP customers allegedly engaged in illicit transactions through Danske Estonia, including money laundering which was discussed by Danske's Board of Directors in August 2007. In light of the Danish FSA's warnings, Danske conducted an internal audit of Danske Estonia's transactions in 2007. That audit did not assess whether Danske Estonia complied with AML and KYC procedures required under applicable laws and regulations, but the audit report provided to Danske management noted that Danske Estonia's procedures in this area were "thin." The 2007 audit recommended to Danske management that Danske undertake further investigation of Danske Estonia's practices to ensure compliance with applicable law.

17.     Further, the Estonian FSA had carried out an inspection at Danske Estonia in March and April 2007 and issued an inspection report on August 16, 2007 which found that the

Estonian branch was not compliant with its legal obligations. On August 27, 2007, only 11 days after receipt of the Estonian FSA report, Danske told the Danish FSA that Danske Estonia was in full compliance with existing laws and regulations.

18.     Despite substantial inherent financial crime risks these NRP customers presented to the bank, Danske failed to monitor adequately NRP customer transactions, failed to fully assess KYC information to verify the identity and business of its NRP customers, and failed to assess whether its AML and KYC policies and procedures were effective with respect to the NRP. The profit from the NRP portfolio was significant and generated a majority of Danske Estonia's profits (before credit losses) in 2008 and 2011-2014. For Danske, the NRP portfolio comprised 2.3% of profits before taxes for Danske between 2009 and 2015 and as much as 4.6% of the profits before taxes in 2011.

19.     Since at least 2009, Danske knew that the NRP customers posed significant AML risks to the bank. Danske knew or should have known that its AML risk mitigation in Estonia was poor and that its compliance procedures were ineffective for the following reasons:

    a.   Danske Estonia used foreign consultants and intermediaries to recruit customers and outsourced its legal obligations to conduct due diligence and obtain KYC information to third parties. As a result, Danske Estonia's NRP customers were able to open accounts without disclosing the true identity of the account owner which is a violation of Danske's AML and KYC legal obligations as well as its internal AML and KYC policies.

    b.   By October 2013, Danske management knew that Danske Estonia was offering certain high risk services and products associated with suspicious activity which Danske did not permit other branches to offer. For instance, Danske Estonia permitted NRP customers to use intermediaries to conceal

their identity and offered securities and foreign exchange "trading solutions" that permitted unknown customers to convert rubles to U.S. dollars and transfer the funds out of Russia.

c.   Since at least 2009, Danske knew that its IT platform was incompatible with Danske's IT platform. Danske knew or was reckless in not knowing that Danske Estonia could not conduct automated AML or KYC controls, such as automated customer screening and automated transaction monitoring. Danske had no access to the IT platform at Danske Estonia and could not effectively monitor its electronic transactions or activity. Due to its awareness of these risks, Danske announced in its 2007 Annual Report that it would upgrade and migrate Danske Estonia to Danske's IT platform, but Danske ultimately opted not to do so for expense reasons.

d.   Danske Estonia's AML and compliance control framework did not adequately mitigate the risks of the NRP portfolio and Danske failed to provide effective supervisory oversight. Danske Estonia's compliance and AML departments were structured differently than at other Danske branches and reported directly to Danske Estonia's branch manager with dotted line reporting to Danske's compliance and AML departments. As a result, Danske Estonia's compliance and AML functions were not effectively monitored or effectively supervised by Danske.

20.   In 2010, Danske acknowledged in its Compliance Half Yearly Report to its Executive Board, comprised of Danske senior managers, that the "compliance culture and set-up in the Baltic countries were not in line" with Danske's overall compliance structure and "***compliance controls were not in place to monitor compliance risks***." (Emphasis added.)

21.     After Danske's internal acknowledgment in 2010 to senior management that compliance controls were not in place in Danske Estonia, Danske continued to receive reports from regulators and U.S. correspondent banks that Danske Estonia's AML and KYC practices did not comply with its legal obligations under EU and Estonian law and that suspicious customer activity was, in fact, ongoing at Danske Estonia.

22.     For example, in February 2012, the Danish FSA contacted Danske to ask about high-risk customers in the Estonian branch and relayed concerns from the Estonian FSA that the Estonian branch had failed to remediate prior AML deficiencies, first flagged in 2007 and again in 2009. In response, Danske misleadingly told the Danish FSA that Danske had "corrected" the noncompliant issues identified by the 2009 Estonia FSA report and that Danske was "fully aware" of the large number of "high risk customers" at Danske Estonia and was "confident that the control setup corresponds to the actual risk." In June 2012, following an on-site inspection, the Danish FSA issued an order concerning Danske's AML framework in Denmark stating that Danske's "risk of being misused for money laundering or financing of terrorism" was high compared to other banks and ordered the bank to take corrective action to comply with AML laws. Danske did not comply with the June 2012 order, and failed to take the corrective action ordered by the Danish FSA. Communications between members of Danske's senior management in April 2013 show that they were aware of the Danish FSA's concerns about Danske Estonia's "blacklisted Russian customers" and that "it is critical for [Danske] that we do not get any problems based on this issue. We cannot risk any new orders in the AML area." In 2014, Danske received a report from the Estonian FSA that Danske Estonia's AML and KYC practices did not comply with its obligations under EU and Estonian law.

23.     Beginning in 2013, U.S. correspondent banks identified or flagged potentially suspicious activity on multiple occasions and raised concerns about problematic AML and KYC

practices. In June 2013, a U.S. bank providing dollar clearing services to Danske Estonia ("Correspondent Bank 1") informed Danske management that it was not comfortable processing transactions for Danske Estonia's NRP customers due to AML concerns, because, *inter alia*, Danske lacked beneficial owner information about shell company customers. In July 2013, Correspondent Bank 1 informed Danske that it would no longer do business with Danske Estonia and ultimately allowed Danske Estonia to exit its U.S. dollar account voluntarily.

24.     As Danske urgently sought to replace Correspondent Bank 1 with another U.S. bank, Danske management conducted a review of Danske Estonia's business both to assess the size of the business and determine whether KYC documentation was adequate. In July 2013, Danske Estonia provided Danske management with a report that clearly identified indicia of suspicious activity and AML violations at Danske Estonia, including: 1) a small number of NRP accounts had transacted approximately [$2 to $4 billion (in U.S. dollars)] per month through Danske Estonia; 2) highly profitable NRP accounts used non-regulated intermediaries which acted on behalf of unknown beneficial owners to effect transactions; and 3) confirmed that the vast majority of Danske Estonia's profits were derived from such NRP transactions. In response to this reporting, in or around September 2013, one Danske manager cautioned that the "over-normal profit is usually a warning sign" of money laundering; another noted that the unregistered intermediaries used in the transactions had no regulatory or supervisory oversight over the NRP customers, so Danske could not take "comfort" in those intermediaries' AML procedures. In October 2013, Danske management discussed that the use of unregulated intermediaries was "extremely high risk" and, while their use was permitted at Danske Estonia, they did "not know of any situation in which such a relationship would be approved" at Danske's headquarters.

25.     In December 2013, a senior-level employee at Danske Estonia reported to Danske management that a specific Danske Estonia NRP customer had engaged in suspicious

transactions evidencing money laundering through the use of shell companies and had provided

false filings with U.K. authorities. In response, in January and February 2014, Danske conducted

audits to investigate the report. Within days, the audit team visiting Estonia concluded that the

documentation concerning certain NRP customers was either missing or false and that many

NRP customers appeared to have intentionally used corporate structures to conceal the identity

of the account owners. The audit found such extensive AML deficiencies at Danske Estonia that

the internal audit team ceased the audit mid-stream, immediately informed a member of Danske

senior management of the nature and extent of the findings, and recommended a "full

independent review of all non-resident customers." The audit letter based on the February review

concluded that Danske Estonia's internal AML controls had failed, that Danske Estonia

conducted business through intermediaries where the customer's identity was unknown and had

failed to conduct due diligence, and that Danske Estonia's customer and transaction monitoring

were "contrary to the legal principals underpinning European legislation" and Danske's

requirements.

26.    These concerns were communicated to Danske's senior management and

acknowledged by at least one, who noted that the issues at Danske Estonia had been going on for

over a year.

27.    In February 2014, Danske hired an external, independent third party to conduct a

limited review of Danske Estonia's AML practices. In April 2014, the third party concluded in a

report issued to Danske management that it had identified numerous AML deficiencies that left

Danske Estonia highly susceptible to money laundering, including 17 identified as "critical or

significant" control deficiencies. Danske's legal department recommended and retained a third

party to conduct a comprehensive internal investigation of Danske Estonia's customers and

transactions and to investigate allegations of employee misconduct. However, Danske senior

management canceled the contract and decided to conduct the investigation internally. An internal Danske working group conducted only limited additional investigation of Danske Estonia at that time.

28.    Between March and July 2014, the Estonia FSA conducted a series of examinations at Danske Estonia and, in September 2014, provided a draft report to Danske Estonia which detailed extensive facts concerning willful violations of Estonian AML law by Danske Estonia employees. The report stated that "Danske systematically establishes business relationships with persons in whose activities it is possible to see the simplest and most common suspicious circumstances" and concluded that Danske Estonia systematically ignored Estonian AML law. Danske acknowledged the severity of the Estonian FSA's findings in communications, including one in which a Danske manager stated, "***It is a total and fundamental failure in doing what we should do and doing what we claim to do***. This just even more underline[s] the need of full clean up now." [Emphasis added.] Another manager stated, "The executive summary of the . . . letter is brutal to say the least and is as close to the worst I have ever read within the AML/CTF area. . . . [I]f just half of the executive summary is correct, then this is much more about shutting all non-domestic business down than it is about KYC procedures . . . ."  Nonetheless, instead of terminating the NRP business, Danske management opted to continue it because of the profits it generated.

29.    In 2015, another U.S. correspondent bank ("Correspondent Bank 2") notified Danske that it had significant concerns about Danske Estonia's AML practices. In internal email, a Danske manager expressed concern about US regulators becoming aware of those concerns:

> [W]e should be mindful that we have a really bad case in Estonia, where I believe that all lines of defence failed. . . We should make sure that we don't create a relationship where [Correspondent Bank 2] suddenly feels the need to share their concerns about Danske with US regulators.

30.     Between September 2015 and January 2016, the Danish FSA sent a draft AML inspection report to Danske which included a reprimand related to Danske's Board of Directors' failure to identify and address risks at Danske Estonia. In March 2016, the Danish FSA issued a final inspection report which was provided to Danske senior management in which it reprimanded Danske for its failure to identify critical risks at Danske Estonia and failure to limit these risks and concluded that Danske was not in compliance with the Danish AML Act and that "the conditions at the bank's branch in Estonia posed a material reputation risk for the bank."

31.     The NRP accounts were largely closed in January 2016 although a few former-NRP relationships and transactions continued until April 2016.

*Deceptive Acts*

32.     Danske engaged in deceptive acts to conceal the activity and compliance failures at Danske Estonia. Since at least February 2012, Danske provided inaccurate, incomplete or misleading information to the Danish FSA and Estonian FSA and/or failed to correct information it later learned was inaccurate. In one instance, the internal audit conducted at Danske Estonia in January and February of 2014 identified information that contradicted what Danske had previously provided to both the Danish FSA and Estonian FSA. Danske did not correct the false information. Rather than disclose the 2014 audit findings, terminate the NRP business and identify criminal activity that the Estonian FSA identified between March and May of 2014, Danske challenged the Estonian FSA's findings in a tone that a Danske manager described as "combative/dismissive."

33.     In 2013, Correspondent Bank 1 informed Danske it would terminate its dollar clearing relationship with Danske Estonia due to concerns about Danske Estonia's AML compliance. So as not to rely exclusively on Correspondent Bank 2, which still provided dollar

clearing services to Danske Estonia, Danske approached another correspondent bank ("Correspondent Bank 3") to replace Correspondent Bank 1. In connection with account opening, Correspondent Bank 3 requested assurances from Danske that its Estonia branch complied with relevant AML policies and procedures established by Danske. Although Danske employees knew this assurance could not be accurately provided, one such employee internally confirmed the requested assurance and another Danske employee, relying on this representation, confirmed that Danske Estonia could open the U.S. dollar account for Correspondent Bank 3.

34.    In May 2015, Correspondent Bank 3 contacted Danske with concerns about suspicious payments and reported that a Danske Estonia employee represented that those transactions were conducted through shell companies that were owned by Russians to conceal their ownership. Correspondent Bank 3 asked Danske to cease transacting these type of payments through it. Despite this request, Danske Estonia continued to route such transactions to Correspondent Bank 3 into April 2016.

35.    As a result of numerous news stories that continued to emerge in 2016 and 2017 that linked Danske Estonia to extensive money laundering schemes, Danske was subject to increasing amounts of public and regulatory scrutiny. Despite recommendations since at least February 2014, Danske did not investigate historical transaction activity in the NRP until September 2017.

36.    In November 2017, news outlets obtained information concerning Danske Estonia's internal audit failures in January and February 2014 that Danske had failed to remediate or disclose at the time. In December 2017, the Danish FSA requested information related to AML issues in Estonia. On May 3, 2018, the Danish FSA issued an order concluding that Danske repeatedly failed to remediate such significant AML deficiencies that Danske could be used for "criminal activities" involving "vast amounts" of money. The Danish FSA also found

14

that Danske was not prompt in closing its NRP business, did not report suspicious criminal activity to authorities, failed to disclose AML violations to regulators, provided false and misleading information to regulators, and failed to investigate or terminate Danske Estonia employees who were "colluding with customers in criminal activities." In September 2018, Danske published a report of its investigation into Danske Estonia. In December 2018, the Estonian Prosecutor's Office filed criminal charges against ten former Danske Estonia employees for money laundering and other offenses that occurred between 2006 and 2016. In early 2019, Estonian authorities ordered Danske to wind down and cease its operations in Estonia.

*Legal Conclusions*

37.     From at least 2009 through early 2016, Danske knew or was reckless in not knowing that its statements to investors in its periodic reports set forth at Paragraphs 6 to 12 above were false and misleading. Since at least 2009, Danske knew or should have known that it lacked transparency into Danske Estonia's conduct because Danske Estonia was not integrated onto the Danske IT platform during the operation of the NRP. Danske also knew or should have known that it could not adequately monitor key risk indicators at Danske Estonia because it could not conduct automated customer and transaction monitoring and could not comply with Danske's AML and KYC policies. In fact, Danske Estonia had different supervisory and control structures than Danske, and, as noted in Danske's 2010 Half Yearly Report to Executive Board, the arrangement was not "in line" with Danske's in part because "compliance controls were not in place to monitor compliance risks." In addition, as set forth above, Danske received substantial information—not only internally, but from its regulators and correspondent banks— that Danske Estonia lacked a comprehensive set of processes to mitigate AML risk, failed to

conduct adequate due diligence on its NRP customers, lacked adequate KYC documentation, and did not conduct automated transaction monitoring or customer screening. As a result, Danske failed to comply with applicable laws designed to prevent money laundering and other illegal activity.

38.     Further, Danske failed to disclose that it had, in fact, identified substantial risks of money laundering and illegal activity throughout the relevant time period and knew Danske Estonia was engaging in transactions that were high risk for money laundering. Danske also failed to disclose that regulators had repeatedly documented AML and KYC deficiencies at Danske Estonia. These omissions rendered Danske's repeated statements to investors that its AML procedures were robust and legally compliant materially misleading in light of the circumstances in which they were made.

39.     These misstatements and omissions were material to investors. In addition to the fact that up to 99% of Danske Estonia's profits were derived from suspicious NRP transactions evidencing potential financial crime and other illegal activity – a fact that would be material to an investor's decision to purchase Danske shares – the risk of non-compliance with AML legal obligations carried legal enforcement risk to Danske, including potential criminal sanctions and penalties, regulatory sanctions and fines, loss of access to financial systems necessary to conduct business (including U.S. correspondent banks) and significant reputational damage.

40.     On September 21, 2017, Danske issued a press release disclosing "major deficiencies in controls and governance" and announced an expanded internal investigation into Estonia's customers and transactions between 2007 and 2015, which it expected to take nine to twelve months. This disclosure identified "three major deficiencies, which in combination meant that Danske Bank was not sufficiently effective in preventing the Estonian branch from potentially being used for money laundering." The full nature and extent of the misconduct at

Danske Estonia and the amount of money involved was disclosed at the completion of the expanded investigation in September 2018.

41.     In November 2017, an Executive Board member sent an internal memo drafted by Danske's Legal Department, Compliance Department, and Corporate Communication & Relations Department to the Chairman of Danske's Board of Directors concerning "expected upcoming media attention related to the bond trading in the Estonian non-resident portfolio." At the time, US authorities were investigating another bank for use of a similar bond trading product. This memo stated that Danske faced "significant consequences" if information about the bond trading product became public because "investors will most likely link this very directly with the risk for US authorities investigation and the risk for fines, which could result in a drop in the share price."

42.     On September 19, 2018, Danske released to the public the results of a comprehensive, voluntary internal investigation into the conduct at Danske Estonia and announced the resignation of its CEO. Between September 21, 2017, and November 1, 2018, Danske's stock price declined by 49.1%.

43.     Danske's deceptive acts concealed information from investors. From at least 2009 through early 2016, Danske's deceptive acts to its U.S. correspondent banks permitted suspicious transactions through the U.S. financial system that would otherwise have been prohibited and rejected by the correspondent banks. These facts were not disclosed to investors.

44.     Under the principles of *respondeat superior*, Danske is responsible for the acts of its officers, directors, employees, and agents.

45.     The NRP relationships were largely closed in January 2016, although a few former-NRP relationships and transactions continued until April 2016, and Danske Estonia was closed in 2019. Danske has undertaken a comprehensive financial crime remediation plan under

the supervision of the Danish FSA and an Independent Expert appointed by the Danish FSA in

2021. That remediation plan is on track to be completed by the end of 2023. All of the employee

conduct described by this Complaint involved Danske employees who are no longer employed

by the bank.

## CLAIM FOR RELIEF

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

46.     Paragraphs 1 through 45 above are re-alleged and incorporated herein by

reference.

47.     Danske, directly or indirectly, in connection with the purchase or sale of

securities, and by the use of means or instrumentalities of interstate commerce, of the mails, or

the facilities of a national securities exchange, knowingly or recklessly: (a) employed one or

more devices, schemes, or artifices to defraud, (b) made one or more untrue statements of a

material fact or omitted to state one or more material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading, and

(c) engaged in one or more acts, practices, or courses of business which operated or would

operate as a fraud or deceit upon other persons.

48.     By its conduct described above, Danske violated and, unless restrained and

enjoined, will continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and

Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## PRAYER FOR RELIEF

Accordingly, the Commission respectfully requests that the Court grant the following

relief:

A.     Find that Danske committed the violations alleged in this Complaint;

B.     Permanently enjoin Danske from violating Section 10(b) of the Exchange Act, 15

U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

C.     Order Danske to disgorge their ill-gotten gains, plus prejudgment interest thereon,

pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act, 1515 U.S.C. §§ 78u(d)(5) and

78u(d)(7);

D.     Order Danske to pay civil monetary penalties pursuant to Section 21(d)(3) of the

Exchange Act, 15 U.S.C. § 78u(d)(3); and

E.     Grant such further relief as the Court deems appropriate.

## JURY DEMAND

The Commission demands a trial by jury on all issues so triable.


Dated:  December 13, 2022          Respectfully Submitted,


                                   */s/ Tracy S. Combs*
                                   Tracy S. Combs
                                   (SDNY Bar No. TS-1026)
                                   Securities and Exchange Commission
                                   351 S. West Temple Street, Suite 6.100
                                   Salt Lake City, Utah 84101
                                   801-524-5793
                                   combst@sec.gov